# AFFIDAVIT OF SPECIAL AGENT ZACHARY MITLITSKY
# IN SUPPORT OF DETENTION

I, Zachary A. Mitlitsky, having been sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"). I make this affidavit in support of the government's motion to detain pending trial HAN LEE and JUNMYUNG LEE ("HAN" and "JUNMYUNG," respectively).

2. I have been employed as a Special Agent since August 2020 and am currently assigned to the Office of the Special Agent in Charge (SAC), Boston, Massachusetts. I am authorized to investigate crimes involving violations of Title 8, Title 18, and Title 19 of the United States Code ("USC"). I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, where I received training to become a Special Agent; specifically, I have received certifications from the Criminal Investigator Training Program in February 2021 and from the HSI Special Agent Training Program in May 2021. I received training relating to the trafficking in persons, including sex trafficking, and other offenses.

3. I am currently assigned to the Human Smuggling and Trafficking Unit, where I investigate interstate and international human trafficking matters. I have participated in investigations of human trafficking, human smuggling, drug trafficking, financial crimes, and related offenses, which have included the executions of arrests and search warrants. Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies. I debrief defendants, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in Massachusetts, nationally, and abroad.

4. The facts in this affidavit come from my personal observations and review of records, my training and experience and that of other investigators assisting on this case, information obtained

from the review of reports, information obtained from interviews of witnesses, and other sources of information gathered through my investigation. During this ongoing investigation, law enforcement has utilized physical, electronic and video surveillance, subpoenaed financial and other records, reviewed public and business records, analyzed phone records, obtained court-authorized search warrants for precise location information for the personal cell phones of the target subjects and the brothel business cell phones (hereinafter, "Boston Brothel Phone" or "Virginia Brothel Phone 1," or collectively "Brothel Phones"), obtained court-authorized warrants to search and seize the brothel websites, conducted witness interviews, and seized prostitution proceeds. This affidavit is intended in support of the government's motion for detention and does not set forth all of my and the other investigators' knowledge about this matter.

5. This affidavit is designed to supplement information previously shared with the Court within my Complaint Affidavit, which I hereby incorporate by reference. I believe that HAN and JUNMYUNG pose a risk of flight under 18 U.S.C. sec. 3142(f)(2)(A) and should be detained pending trial. I believe this based upon, among other things, the strength of the case and evidence against them, the nature of the offense and corresponding elements of deceit, their financial resources (both known and unknown), their lack of genuine ties to the community, their inability to work and support themselves due to their immigration statuses, and the potential penalties they face upon conviction.

## BACKGROUND OF THE INVESTIGATION AND HAN AND JUNMYUNG's ROLES IN THE PROSTITUTION NETWORK

6. From at least July 2020, HAN Lee ("HAN"), JAMES Lee ("JAMES"), and JUNMYUNG Lee ("JUNMYUNG"), and others known and unknown, operated an interstate prostitution network with multiple brothels in greater Boston and eastern Virginia. The targets advertise the prostitution network on websites, specifically www.bostontopten10.com and www.browneyesgirlsva.blog, under the guise of nude model photo shoots. The targets also rent high-end apartments that commercial sex workers then use to engage in sexual services for cash with

customers from these websites. The co-conspirators collectively set up the infrastructure for the brothels in multiple states to persuade, induce, and entice the women to travel interstate to engage in prostitution. More specifically, they established and maintained websites advertising the women, the local brothel phone numbers used to communicate with customers to arrange for commercial sex for a fee, the high-end apartments where the women engaged in the commercial sex with customers and stayed overnight during their "tour" in a specific city, and the transportation to and from airports and brothel locations.

7. As detailed in my Complaint Affidavit and further below, HAN is the leader and organizer of this prostitution network. In that capacity, among other things, HAN communicated with and recruited women to travel interstate and engage in commercial sex for cash in Boston and eastern Virginia; she maintained the websites and business records associated with her organization; she maintained the brothel units (both in Massachusetts and in her regular travels to Virginia) and has been seen picking up and dropping off females, dropping off supplies, paying for the rent and utilities, and entering and exiting the units regularly; she concealed over one million dollars in prostitution proceeds by purchasing structured money orders, making cash deposits into known U.S. bank accounts, and engaging in various bank and peer-to-peer (P2P) account transfers; she maintained brothel cell phones and arranged appointments for the customers and commercial sex workers; she enlisted JAMES and JUNMYUNG to rent apartments used for the prostitution business; she paid for plane tickets for JAMES to travel Boston and eastern Virginia to lease these apartments and compensated him $1,000 a month for maintaining the leases in his true and fraudulent identities; and, she paid for air travel and rideshares for the commercial sex workers who traveled to Boston and eastern Virginia.

8. JUNMYUNG is an employee of HAN and her prostitution business. In that capacity, based on his post-arrest post-*Miranda* audio and video recorded interview, JUNMYUNG was paid by HAN approximately $6,000 to $8,000 in cash per month. Physical, electronic and video surveillance during the investigation showed that JUNMYUNG: carried and maintained the brothel cell phones and

communicated directly with the sex buyers and booked appointments for the customers and the women advertised on both the Virginia and the Boston brothel websites; assisted the commercial sex workers with their luggage and groceries when they arrived at and left the Boston brothel locations; transported the women to various brothel locations, sometimes more than one location in a given day; and, collected prostitution proceeds from the various brothel units. JUNMYUNG placed at least one brothel lease in his name. I believe he purchased his 2018 Chevrolet Corvette using prostitution proceeds.

**STRENGTH OF THE CASE**

9. As detailed in my Complaint Affidavit, the evidence against HAN and JUNMYUNG and their participation in this interstate prostitution network is strong. I believe that evidence was only strengthened upon execution of nine residential search warrants in three different jurisdictions on November 8, 2023.

10. During the execution of the search warrants at the six different brothel locations (four in Massachusetts and two in Virginia), investigators recovered multiple Asian women who were then-advertised, by their respective stage names, for commercial sex on www.bostontopten10.com and www.browneyesgirlsva.blog websites. Investigators learned that these women traveled interstate and to Boston and Virginia to engage in sex with men in exchange for cash. From the various brothel locations, investigators recovered items consistent with prostitution, including condoms, lubricant, bulk cash, and cell phones. Pursuant to the warrants, investigators searched the cell phones of the women. During a search of one of those cell phones, investigators located communications over the social messaging application KakaoTalk with an individual with a screenname of "okokpug" and photograph depicting a "pug" dog.[1] I believe HAN, whose dog was depicted in the photograph, is the user of the "okokpug" KakaoTalk account. During these communications, HAN not only listed a brief description of the anticipated customers, expected sexual services and corresponding pricing, and

[1] I am aware that HAN owns three pugs.

schedule of appointments for the day, but also set forth what I believe to be her house rules for commercial sex workers engaging in sex for a fee at the brothel apartments. The "house rules" are depicted below in the three photographs of cell phone screenshots:










**A. Search Warrant at HAN's – 80 Cambridgepark Drive, Unit 638, Cambridge**

11. From HAN's apartment, investigators recovered items used to maintain and operate her prostitution business. These items not only included bulk quantities of condoms stored in bags and cardboard boxes, boxes of bulk-purchased lubricants, lingerie, UTI testing kits, pregnancy testing kits, mouthwash, and fake eyelashes, but also included over $22,000 in cash, ledgers, multiple cell phones, dozens of stored value cards (such as Vanilla and Visa gift cards), laptop computers and thumb drives, three sets of keys containing eight keys and seven key fobs, financial records and various bills and documents, and receipts of money orders.

12. Specifically, from HAN's apartment, which she appeared to reside in on her own, were at least sixteen (16) cell phones, three of which were on her bed. One of the cell phones from her bed was the Virginia Brothel Phone 1, which I know to be associated with the phone number listed on the Virginia Brothel website and used to communicate with sex customers to set up appointments. Also on her bed was a MacBook computer, which I believe was used to maintain the brothel websites and communicate with customers and commercial sex workers.

13. I believe that HAN's financial and business record keeping was impeccable. From a shelf, investigators seized a Louis Vuitton shoe box which contained hundreds of money order receipts for both Western Union and United States Postal Service that appeared to be organized by date, location, and rent amount. The shoe box also contained utility bills for HAN's apartment, as well as other target locations. While investigators were previously aware of hundreds of thousands of dollars of money orders purchased by the co-conspirators which were used to both conceal prostitution proceeds and to promote and pay for operational expenditures of the prostitution network, I believe that additional (previously unaccounted for) money orders are contained within this shoe box as well.

14. Likewise, HAN maintained ledgers detailing the daily activity of her brothels. At the time of the search warrant execution, one such ledger was open to a page showing the stage names, appointment dates and times and earnings of the women, specifically "Tina" and "Yoko DDD," who were then-listed on the Virginia brothel website (that is, www.browneyesgirlsva.blog). Notably, during the search warrant execution at the Tysons, Virginia brothel location, investigators recovered an Asian female who went by the stage name of "Tina." Next to the ledger were envelopes containing bulk cash and handwritten notes with the stage names of women and a tally of their earnings. The ledger and some of the envelopes containing cash, are depicted in the two photographs below:


Parliament


CELINE
11/6 110 x 3 = 330

15. In addition to the prostitution business items noted above, investigators also located at HAN's apartment items indicative of HAN's lavish and extravagant spending habits. I am aware that HAN lacks legitimate employment. Despite this, investigators located luxury bags and shoes, including, items from Yves St. Laurent, Givenchy, Louis Vuitton, Christian Louboutin, and Jimmy Choo. I am aware that HAN's bank records reflect purchases at other luxury stores, including, Balenciaga. The Louis Vuitton shoe box (which served as a filing cabinet for her prostitution business) had a sticker price for the shoes in the amount of $1,360. Agents also seized signed blank checks in the name of J.Y.P. Agents located $22,608 in cash, dozens of stored value cards, and used lottery tickets throughout her apartment, some of which are depicted in the photograph below:




**B. Search Warrant at JUNMYUNG's – 71 Legacy Boulevard, Unit 207, Dedham**

16. From JUNMYUNG's apartment, among other items, agents seized $5,000 in cash, four ledgers/appointment books, two computers, two SIM cards, and six cell phones. Of those six cell phones, one of them was identified as the Boston Brothel Phone, that is, the phone used to communicate with and book appointments for customers interested in engaging in commercial sex with women advertised on www.bostontopten10.com. The ledgers located in JUNMYUNG's apartment were appointment books documenting daily scheduling of women at the various brothel locations in both

Boston and Virginia. Because JUNMYUNG possessed the Boston Brothel Phone and these appointment books at the time of the search warrant execution, I believe that he was in charge of booking the appointments for the sex customers to engage in commercial sex with the women working at the Boston brothel locations. Redacted pages of the appointment books are in depicted in the three photographs below. The first photograph lists the locations and stage names of the women (including "U-mi," "Celine," "Jade," and "Coral") advertised on www.bostontopten10.com on November 8, 2023, that is, the date of the search warrant execution. Agents recovered women with stage names of "Jade" and "Coral" (i.e., the "Duo") at 90 Fawcett Street on November 8, 2023. The latter two photographs show different appointment books and the pages from them dating back to at least early 2022. Collectively, these three photographs show that the prostitution network not only maintained meticulous daily records of their operation, but also kept those records for a lengthy period of time.






17. Additionally, agents administratively seized JUNMYUNG's Corvette, for which a down payment was believed to have been made using prostitution proceeds. A photograph of the JUNMYUNG's Corvette is depicted below.



## HAN and JUNMYUNG's FINANCIAL RESOURCES

A. **Overview of the Financial Component of the Prostitution Network**

18. Based on my training, experience and familiarity with the investigation, coupled with numerous interviews conducted with customers of this prostitution network, and as described in greater detail in my Complaint Affidavit, I know that the prostitution business is a cash business. Whereas it is common for legitimate cash businesses to simply deposit their cash earnings into a bank account, individuals associated with criminal activity often take measures to conceal or disguise the nature, source, location, ownership, or control of their criminal proceeds to avoid detection from law enforcement. This concept is called "concealment" money laundering and can be accomplished in any number of different ways. Some of the techniques believed to have been utilized by the co-conspirators in this investigation include having multiple members of the organization deposit cash proceeds into their own accounts, thereby spreading them out, converting the cash proceeds into money orders to make the funds appear more legitimate, utilizing third party bank accounts to receive deposits and conduct subsequent financial transactions, and co-mingling criminally derived funds in accounts containing other revenue sources. To further assist in concealing the criminal proceeds, the co-conspirators also engaged in "structuring," (intentionally splitting larger amounts of money into a series of smaller sums to avoid scrutiny from law enforcement or compliance obligations), both in the manner in which the co-conspirators made cash deposits into their own accounts, as well as the manner in which they converted cash into money orders, in order to avoid reporting requirements.

19. Criminal networks also frequently engage in "promotional" money laundering, which involves using proceeds generated from the underlying criminal act, in this case prostitution, to further perpetuate the ongoing criminal activity. In this particular case, the co-conspirators have utilized their criminal proceeds to pay monthly rents at the various brothel locations, pay co-conspirators to rent apartments in their name so they could be utilized by the network, pay the travel expenses of the women working at the brothel locations, pay for the websites and telephones utilized to solicit and engage with

customers, and countless other operational expenditures that enable the ongoing success of the prostitution network.

20. Both HAN and JUNMYUNG engaged in both concealment and promotional money laundering in an effort to hide the source and nature of the prostitution proceeds. In support of this contention, I rely on paragraphs 60-70 of my Complaint Affidavit which I incorporate herein by reference. As described in my Complaint Affidavit, HAN structurally purchased hundreds of thousands of dollars of money orders from USPS and Western Union which she then used to pay for various expenses tied to the prostitution business. Both HAN and JUNMYUNG engaged in repeated structured transactions and cash deposits into their own respective bank accounts, and in the case of HAN, occasionally into the bank accounts of others. Both used the proceeds of the prostitution business to cover various operational expenses, not limited to, travel and transportation expenses, rent and utility payments of the brothels, and payments of website maintenance fees.

B. **HAN's Financial Resources**

21. Simply stated – I do not believe that HAN has legitimate employment but I do believe she has made an astounding amount of money running her prostitution business over the last several years. Despite significant surveillance during the investigation, HAN has never appeared to engage in any legitimate work. HAN made conflicting statements when describing her employment income when applying for apartment rentals or to immigration authorities. From a review of her A-file, on September 23, 2019, HAN indicated on an I-130A form that she has been unemployed since March 15, 2015 and that her last employment was that of a fashion store owner in South Korea from February 1, 2009 to March 15, 2015. In June 2020, HAN submitted an application in connection with her rental at 80 Cambridgepark Drive, Apt 638, in which she stated that she was employed by "Manufacturers Association of South Korea" since June 2017 earning a monthly income of $9,000 per month. However, in March 2023, when HAN completed an application in connection with her rental of 90 Fawcett Street, Unit 530, in Cambridge, Massachusetts, she stated that she works as a medical director

for a different employer named J.P., earning $12,000,[2] a position she claimed to have held since March 11, 2019, which pre-dates her statement in June 2020 that she was working elsewhere. In any event, based on regular surveillance, investigators are aware that HAN is not employed as a medical director, nor does she maintain any form of legal employment.

22. During the investigation, law enforcement identified two active checking accounts held in HAN's name at Bank of America. Records for these accounts were reviewed from December 2019 through October 2023, during which time approximately $965,000 was deposited into the two accounts. None of these deposits appeared to have been derived from a legitimate income source, such as direct deposit or recurring weekly payroll checks. Rather, the deposits included approximately $800,550 in cash deposits, $136,500 in electronic transfers from various individuals, and approximately $15,000 in money orders. Of the cash deposited into the two accounts, over $300,000 was deposited within the last one-year period. The P2P transfers originated from several different individuals, including more than $20,000 from co-defendant JUNMYUNG. While the funds in HAN's Bank of America accounts were disbursed via a variety of ways, it is noteworthy that more than $425,000 was transferred by HAN via P2P transfers to approximately thirty different people, indicative of a large network of individuals transacting with HAN.[3]

23. Additionally, between December 2020 and October 2023, HAN made credit card purchases totaling $186,665 that included a variety of charges, including approximately $10,500 in airline costs and just under $15,500 in Uber/Lyft charges, many of which I believe were used to pay

[2] The application asked for gross annual income, however, it appears that HAN's response of $12,000 was intended to indicate her gross monthly income, given that the monthly rent for the apartment for which she was renting was $2,728, which calculates to more than $32,000 annually.

[3] Investigators obtained seizure warrants for HAN's personal checking accounts which were served on Bank of America on November 8, 2023. Despite the significant flow of funds into HAN's checking accounts, the resulting balances were in the amounts of $5,567.89 and $75.92.

various expenses of the prostitution network. The airline charges incurred included travel for HAN, as well as third parties, some of whom have been identified by law enforcement as commercial sex workers at the brothel locations, and at least five trips for JAMES to either Boston or Virginia in May 2021, July 2021, January 2022, August 2022, and October 2023. Based on what I have learned in this investigation, I believe that HAN used cash proceeds from the brothels to pay for her own travel to check on her brothels, to pay for the women to transition from one brother to another (including via rideshares), and to pay for JAMES to travel to secure the brothel rentals.

24. In addition to the two known domestic bank accounts held by HAN, investigators are aware that HAN maintains a bank account at Kookmin Bank in South Korea. HAN has transferred approximately $89,700 to her foreign bank account via international transfer providers Remitly, WireBarley, and Wise Ltd with funds that originated from her Bank of America accounts. In addition, a review of bank surveillance photos for a sampling of transactions revealed that HAN is also utilizing a bank account held in the name of Y.K. to make cash deposits and conduct financial transactions. There have been approximately $40,000 in international transfers via Remitly and WireBarley conducted from Y.K.'s account, some directly sent to HAN and some sent to another individual, whose relationship to HAN is currently unknown.

25. In August 2023, a combined total of $164,200 was sent via bank or P2P transfers to her alleged husband, M.B., from accounts held by HAN, Y.K., and a third individual, S.C., with a mailing address of one of the Cambridge brothel locations. Since receiving those funds, M.B. has sent more than $30,000 in international transfers via Remitly and Wise Ltd and has conducted cash withdrawals in excess of $14,000 from ATMs located in Brazil. Given the lack of visibility to foreign accounts, investigators have not yet been able to determine if any of the funds that were sent by HAN

to M.B. were subsequently repatriated back to HAN in foreign accounts.[4]

26. During the search warrant executed at HAN's residence on November 8, 2023, investigators uncovered signed blank checks from a Wells Fargo bank account held in the name of J.Y.P. A historical review of the account activity in this account revealed that between 2020 and 2022 deposits into the account totaled approximately $373,000, including more than $140,000 in P2P transfers from various individuals, including HAN, cash deposits totaling approximately $97,000, and deposits from a crypto currency exchange totaling approximately $25,500. The extent to which HAN may control the funds maintained in this Wells Fargo account, aside from the blank checks, is currently unknown.

27. HAN's current financial position cannot reasonably be determined at this time given the activity described above. Specifically, HAN is known to maintain at least one foreign bank account

[4] I am aware from conversations with the Assistant United States Attorney on this case that the Pretrial Services Department of the U.S. Probation Office is recommending that HAN be released on a $50,000 unsecured bond by a third-party, that is, (as the pretrial services department characterized it, "[HAN's] estranged husband, M.B.") to be signed within 14 days and that M.B. will maintain HAN's lease until at least June 2024. From my investigation, I am aware that M.B. is presently out of the country and has been so since around June 2023. I am also aware from HAN's recorded interview that M.B. may not even reside within the United States and that she has been separated from him for four years. Despite this separation, in March 2022, M.B. sent a letter to USCIS asking that they schedule his "spouse beneficiary" interview "without further delay" so that HAN could obtain her provisional green card. Regardless of the candor (or lack thereof) about the legitimacy of HAN and M.B.'s marriage or separation, from our financial investigation, I know that M.B. maintains a personal bank account with JPMorgan Chase, for which he is the sole authorized signor. The last known balance in his account as of October 26, 2023 was approximately $42,000. M.B. is also known to hold a joint personal checking account at Eastern Bank with another female, S.M., (i.e., not HAN), however, the current account balance of that account is unknown. Also from our financial investigation, I am aware that M.B. previously maintained accounts at Bank of America, including a personal account, as well as two business accounts held in the name of his med spa, for which he and S.M. were authorized signors. All three of these accounts were overdrawn and closed in early November 2023. The only other known active business account held in the name of the med spa, for which M.B. and S.M. are authorized signors, is maintained at JPMorgan Chase and as of October 31, 2023, had a last known balance of approximately $12,785. While I do not have visibility of any foreign assets that M.B. may have, based upon our financial investigation, M.B. does not appear to have sufficient personal financial resources to financially support HAN's release, which would include daily living expenses and monthly rent payments, which are known to be $3,600 per month through at least June 2024, per her current lease agreement.

in South Korea, however, investigators currently do not have any visibility to the balance or overall volume of activity. While investigators have been able to identify some funds transferred by HAN in her own name, she has also moved funds to South Korea via an account held by a third party (Y.K.) and transferred a significant amount of money to M.B., who appears to also be moving funds outside the United States. Finally, HAN appears to have at least some level of control over three different accounts held in the names of third parties (e.g., Y.K., S.C., and J.Y.P.), so there is significant concern by investigators that HAN may have control over other accounts not yet identified, particularly given her large peer financial network.

C. **JUNMYUNG's Financial Resources**

28. As described in my Complaint Affidavit, per his own statements made in his auto loan application and apartment lease application, JUNMYUNG is a student. As such, he has no discernible income. JUNMYUNG signed a lease for one of the brothel units in June 2022. On June 8, 2022, two days after JUNMYUNG submitted the rental application for 90 Fawcett Street, Unit 435, JUNMYUNG, the "student" who reported on the rental application that he had no discernible income, deposited $35,700 cash into a personal checking account held solely in his name. Prior to that cash deposit, JUNMYUNG had $1,000 in that account. On June 20, 2022, JUNMYUNG purchased a 2018 Chevrolet Corvette from an auto dealership in Quincy, Massachusetts for a base price of $69,490. JUNMYUNG made a downpayment of $25,500, as well as an additional debit card payment of $315, utilizing the cash that he had just recently deposited into his personal checking account. Based upon my familiarity with the investigation, I believe the $35,700 in cash that JUNMYUNG deposited into his checking account was a payment for opening the brothel lease in his own name. I also believe that the down payment on his Corvette involved the use of proceeds of the prostitution business.

29. JUNMYUNG maintained a personal checking account at Bank of America. Records reviewed for a period of December 2019 through September 2023 showed that deposits totaled approximately $378,365, including $193,822 in cash deposits and more than $100,000 in Zelle

transfers from various individuals. The activity in JUNMYUNG's personal checking account ramped up significantly in 2022 and 2023 as compared to previous years, which I believe is consistent with him taking on additional responsibilities in the prostitution business. Whereas the account had averaged annual deposits in 2020 and 2021 of just over $50,000, total deposits in 2022 were $175,000 and through just over eight months in 2023 totaling approximately $100,000. Zelle transfers made into JUNMYUNG's account from HAN and Y.K. resulted in a combined total of $22,613. The cash and transfers from HAN and Y.K deposited into JUNMYUNG's personal checking in the last one-year totaled $56,020. Since January 2022, JUNMYUNG has received approximately at least $98,000 in P2P transfers into his bank account.

30. Disbursements from JUNMYUNG's checking account during the same period beginning in 2022 through September 2023 totaled $265,662, which included payments towards his Bank of America credit card ($67,977), Zelle payments to various individuals ($55,726), the purchase and subsequent loan payments towards his Corvette ($46,053), rental payments for what is believed to be toward his rented apartment in Dedham ($39,160), and cash withdrawals totaling ($34,330). There was a single electronic payment of $1,205 in April 2023 to Atmark, the managing company of the Fawcett Street apartments. Additionally, while the payments applied to JUNMYUNG's credit card were for a variety of purchases, there were approximately $4,500 in Turo Inc. charges, which investigators have learned is from where JUNMYUNG regularly rents vehicles used to transport commercial sex providers to and from the brothel locations. The outgoing Zelle transfers from JUNMYUNG's checking account to HAN and YOSHEP combined totaled $18,431.

31. Based on the above, including the fact that neither HAN nor JUNMYUNG has lawful employment, I do not believe that there is any reason for JUNMYUNG (who is a student) or HAN to have access to such a large amount of cash during a short period of time unless that cash was through an illegal enterprise like this highly profitable prostitution network.

**HAN and JUNMYUNG LACK LEGITIMATE TIES TO THE COMMUNITY**

32. Neither HAN nor JUNMYUNG maintain legitimate ties to the community which thereby makes them both a risk of flight. Neither are United States Citizens. While indeed JUNMYUNG is here on a student visa to attend a computer institute in Boston, he does not appear to have any other familial, community, or employment ties to the United States.

33. As to HAN, notwithstanding the validity of her questionable marriage to M.B., I believe that HAN has made multiple false statements to immigration authorities in an attempt to gain a provisional green card. Based on a review of HAN's A-file, on or about September 23, 2019, HAN submitted a I-485 form, which I know to be an application to register permanent residence. In her I-485 form, HAN indicated she arrived in the United States, specifically Atlanta, on a visitor's visa (which she admittedly overstayed) on April 18, 2015. She indicated that on August 2, 2018, she married M.B., who is a naturalized United States Citizen and was the petitioner for her application.[5] HAN answered questions on her I-485 form in support of her application to register permanent residence. Some of those questions, particularly ones under the "General Eligibility and Inadmissibility Grounds" and HAN's answers to those questions, are below:

| Question number | Question | Answer |
|---|---|---|
| 35 | Have you **EVER** engaged in prostitution or are you coming to the United States to engage in prostitution? | No |
| 36 | Have you **EVER** directly or indirectly procured (or attempted to procure) or imported prostitutes or persons for the purpose of prostitution? | No |
| 37 | Have you **EVER** received any proceeds or money from prostitution? | No |
| 38 | Do you intend to engage in illegal gambling or any other form of commercialized vice, such as prostitution, bootlegging, or the sale of child pornography, while in the United States? | No |

[5] I understand from the Assistant United States Attorney assigned to this case that HAN (and M.B.) represented to the pretrial services department that they married seven years ago and separated in 2019. But, as detailed herein, she did not fill out her I-485 form with immigration until September 2019.

| | | |
|---|---|---|
| 41 | Have you **EVER** induced by force, fraud, or coercion (or otherwise been involved in) the trafficking of persons for commercial sex acts? | No |
| 42 | Have you **EVER** trafficked a person into involuntary servitude, peonage, debt bondage, or slavery? Trafficking includes recruiting, harboring, transporting, providing, or obtaining a person for labor or services through the use of force, fraud, or coercion. | No |
| 43 | Have you **EVER** knowingly aided, abetted, assisted, conspired, or colluded with others in trafficking persons for commercial sex acts or involuntary servitude, peonage, debt bondage, or slavery? | No |
| 45 | Have you **EVER** engaged in money laundering or have you **EVER** knowingly aided, assisted, conspired, or colluded with others in money laundering or do you seek to enter the United States to engage in such activity? | No |
| 46.e. | Do you intend to: Engage in any other unlawful activity? | No |

34. At the end of the form and this list of questions, was the following statement: "I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct." Below that statement, HAN signed her name as "Han A Lee" in ink, typed in the date (September 23, 2019) and typed in her email address of HANAA1009@xxxxx.COM.[6]

35. The email address that HAN listed as hers on her I-485 application on September 23, 2019 is the same email address provided by the customer "Han A Lee" as contact details (with a sign up date of August 12, 2016) for the www.bostontopten10.com domain registration as depicted in the below screenshot of subpoenaed records:

[6] The full email address is known to me but is not being listed at this time.

**bostontopten10.com**

Overview

**Customer Information**

| Customer ID | Name | Contact Details |
|---|---|---|
| [redacted] | Han A Lee | hanaa1009@[redacted]com<br>+1[redacted]7065<br>+1[redacted]7065 |

**Domain Registration** (Order ID:[redacted])

| Current Status | Created On | Expires On | Privacy Pro |
|---|---|---|---|
| Active | Aug 12, 2016 | Aug 12, 2023 | Enabled |

| Registrant Details | Admin Details |
|---|---|
| Han A Lee<br>bostontopten@[redacted]com<br>Website<br>120 cambridge park<br>cambridge<br>MA<br>United States 02140 | Han A Lee<br>bostontopten@[redacted]com<br>Website<br>120 cambridge park<br>cambridge<br>MA<br>United States 02140 |

36. Based upon my familiarity with the investigation, I believe that HAN's September 23, 2019 statements on her I-485 form related to her involvement (and anticipated involvement) in prostitution, money laundering, and unlawful activity were false. At the time that HAN made her I-485 statements, I am aware that the www.bostontopten10.com website was active and was tied to her personal email address. I further believe that HAN's false statements to immigration authorities about her intentions while residing in the United States shows her willingness to engage in a lack of candor with any federal authorities, including this Court. Therefore, I believe HAN is a risk of flight.

## CONCLUSION

37. For the foregoing reasons and those to be offered at the detention hearing, I believe there is a preponderance of the evidence to believe that HAN and JUNMYUNG are a risk of flight and should be detained pending trial.

Respectfully submitted,

Zachary Mitlitsky
Special Agent
Homeland Security Investigations