## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 24-cr-10035-JEK |
| HAN LEE | |

### SENTENCING MEMORANDUM OF THE UNITED STATES

In the three years leading up to her arrest in November 2023, Han Lee ("Han"[1] or the "Defendant") led one of the most successful prostitution networks on the east coast of the United States. Han profited immensely off women selling their bodies for sex and she concealed multi-millions of dollars of illicit proceeds earned from her business. Han enticed and recruited women to travel to Massachusetts or Virginia from other states, and on thousands of occasions, directed women to have sex with strangers for money. She made a staggering total amount of money – at least $5.46 million dollars over more than four years – and used sophisticated means to hide that money from law enforcement.

Her guideline sentencing range ("GSR") of 51-63 months does not adequately reflect the nature and circumstances of her offenses, her history and characteristics or the needs of sentencing. For the reasons outlined in more detail below, the government is seeking an above guidelines sentence of 72 months incarceration, three years of supervised release, a fine, a $200 special assessment, and forfeiture, including a money judgment exceeding $5.4 million, as set forth in the government's motion. (D.E. 157). Such a sentence is sufficient, but not greater than necessary to achieve the goals of sentencing pursuant to 18 U.S.C. § 3553(a).

---

[1] The Government refers to the defendant by her first name here for clarity sake, given that other co-defendants share the same last name.

## I.    **THE PRESENTENCE REPORT**

### A.  **The Probation Department Correctly Applied the Guidelines and Properly Calculated the Guideline Sentencing Range**

The government's sentencing recommendation is based on a careful analysis and weighing of the 18 U.S.C. § 3553(a) sentencing factors, which the government anticipates will be the focus of the upcoming sentencing hearing. Nonetheless, the Court must begin, as required, with a calculation of the GSR applicable to Han.

As stated in the presentence report ("PSR"), based on §2X1.1, the base offense level for 18 U.S.C. § 371 is the base offense level for the substantive offense. Here, the substantive offense is 18 U.S.C. § 2422(a); therefore, the calculations called for by the U.S. Sentencing Guidelines ("USSG") begins with a base offense level of 14. *See* PSR ¶ 12; USSG §2x1.1, §2G1.1(a). As for count two, pursuant to §2S1.1, the base offense level is the offense level for the underlying offense from which the laundered funds were derived if that offense level can be determined and the defendant committed the offense. *See* PSR ¶¶ 13, 17; USSG §§2G1.1(a); 2S1.1(a)(1). The offense level is increased by two levels because Han was convicted under 18 U.S.C. § 1956. PSR ¶18; USSG §2S1.1(b)(2)(B). The defendant engaged in sophisticated money laundering; therefore, her offense level is increased by two levels. PSR ¶19; USSG § 2S1.1(b)(2)(B). Because she was a leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels are added. PSR ¶21; USSG § 3B1.1(a). Pursuant to the grouping analysis, five levels are added because there are more than five victims for which the offense level would have been equally serious. PSR ¶¶54-56; USSG §§ 2G1.1(d)(1); 3D1.4.

The base offense level and enhancements above, all of which are well-supported by the evidence in the PSR, add up to an adjusted offense level of 27. *See* PSR ¶ 57. Even after a three-level reduction for acceptance of responsibility – which is charitable given that Han continues to

deny her role related how she treated the women – her total offense level is 24. With a criminal history score of I, Han's GSR is 51-63 months.

**B.  The Court Should Overrule the Defendant's Objections and Adopt the PSR as the Factual Findings of the Court.**

The PSR lists ten objections by the defendant and the Probation Officer's responses to each. The government responded to many of these objections and this Court should overrule all of them for the reasons detailed in the government's and Probation Officer's responses. The defendant's objection to the four-level leadership enhancement is not supported by the evidence. In addition to being a leader of James Lee and Junmyung Lee in the money laundering enterprise, Han was the leader of at least six other people, all of whom were referenced in the facts in the PSR. *See* PSR ¶¶60-64 and Govt's Response to Defendant's Objection PSR at p. 55. "A defendant may be subject to a four-level enhancement even if the defendant managed only one participant." *See United States v. Mi Sun Cho*, 713 F.3d 716, 722 (2nd Cir. 2013) (cleaned up) and USSG §3B1.1, cmt. n. 2. Here, the defendant directed others to open bank accounts which she used exclusively for prostitution proceeds; one such individual (Y.K.) drove her to the various brothel apartments to collect prostitution proceeds before depositing those proceeds in bank accounts. Han held blank checks and accessed bank accounts in the names of at least two prior individuals who rented brothel apartments for her organization, which she used for peer-to-peer transfers, overseas transfers, cash deposits and crypto deposits. She moved money in a structured manner through accounts of various third parties to her husband, M.B.  Han directed at least one other individual to exchange cash into Western Union money orders and wired money. Han used her account and the account of Y.K. to pay James Lee by making peer-to-peer transfers with James Lee's wife. Clearly, Han's ability to launder money would not have worked without the participation of others. *See*, *United States v. Carrero Hernandez*, 643 F.3d 344 (1st Cir. 2011) (affirming four-point adjustment where defendant's criminal activity required cooperation of others) and *United States*

*v. Tejeda-Beltran*, 50 F.3d 105, 110-111 (1st Cir. 1995) (examining the "status determination" and "scope determination" required by the district court for analyzing enhancement under § 3B1.1(a)). Thus, while the government only needs to prove by preponderance of the evidence that more than five individuals engaged in laundering of illicit proceeds at Han's behest (the status determination) *or* that the scope of Han's laundering can be deemed "otherwise extensive" (the scope determination), both factors are in fact present here.

The First Circuit has rejected a defendant's contention that the elements of role in the offense pertaining to "five or more participants" and "otherwise extensive" are restricted solely to the offense of conviction. *United States v. Lucena-Rivera*, 750 F.3d 43 (1st Cir. 2014) (affirming four-point role adjustment for money laundering conviction despite defendant's argument that four-point role adjustment existed only for drug trafficking relevant conduct) and *United States v. Laboy*, 351 F.3d 578, 585-86 (1st Cir. 2003) (holding court may draw on all relevant conduct when determining whether defendant was an "organizer or leader" for purposes of the guidelines). Against this backdrop, the Court should overrule the defendant's argument that the four-point role enhancement should not be applied because the guidelines are calculated under § 2S1.1 and not § 2G1.1. this Court should overrule Han's argument because the evidence supports by preponderance of the evidence a four-point increase for an aggravated role.

To the extent the defendant attempts to use the objections to impress upon the Court that she was a "kind" boss who paid well and did not force women to engage in sex work, these are points that the defendant can argue at sentencing and are not *factual* disputes that this Court must resolve. Instead, the Court should adopt the offense conduct listed in the PSR ¶¶ 7-68 as the factual findings of the Court. *See* Fed. R. Crim. P. 32(i)(3)(A) (stating that a sentencing court "may accept any undisputed portion of the presentence report as a finding of fact").

## II.    THE SENTENCING FACTORS OUTLINED IN 18 U.S.C. § 3553(a) SUPPORT THE GOVERNMENT'S RECOMMENDED SENTENCE.

The sentencing factors outlined in 18 U.S.C. § 3553(a) support the government's recommended sentence of 6 years in custody. As this Court is aware, the guidelines are a "starting point and initial benchmark" in sentencing proceedings. *Gall v. United States,* 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the seven factors outlined in §3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from future crimes of the defendant. *Id.* at 50, n.6.

The First Circuit has repeatedly emphasized that once a defendant's GSR has been correctly calculated, "sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2007). Accordingly, "a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them." *Id.* at 91. Those sound, case-specific reasons exist here and counsel in favor of a slightly above-guideline sentence of 72 months.

### A.  The Nature and Circumstances of the Crime

#### 1.  The Harm to the Women

Dozens and dozens of women engaged in commercial sex work at Han's direction over many years. Han set up the infrastructure to entice them to travel from other states to Massachusetts and Virginia to sell their bodies for sex. While the government believes that the women engaged in sex acts under the legal standard of "voluntarily," they were vulnerable women who were

exploited by the defendant.[2]  The Government also asserts that while the women were not "forced" or "coerced" by Han to engage in commercial sex, as defined by federal law, of course this was not their *choice*.  To have a price set for one's body and to engage in repetitive sex acts with strangers is a choice for those with limited or no other choices. Han knew this.  Additionally, if the women wanted to have sex the buyers sent to them by Han, the buyers would not have had to pay for it.  The buyers knew this.  Han was the leader of a commercial enterprise in which she, her co-defendants, and the men willing to pay for access to women's bodies benefitted.  The only parties harmed were the women "working" for Han.

Han offered men the opportunity to buy the women who worked for her business. Han and the men who purchased sex acts from the women treated the women as commodities and not as people. Han's business offered a wide array of services for the men, including "bare back" ("BB"), which is sex without a condom, the "girlfriend experience" ("GFE") which blurs the line between commercial sex and dating, and a "Duo," which involves two commercial sex workers having sex with one sex buyer. The types of services available should not distract from what this way: an exchange for money for access to someone's body.

The crime of prostitution often is viewed as a simple and victimless crime. Such a perception ignores the long-term impact on the women and society. At the most basic level, profiting off of the sale of other women's bodies involves the degradation of women because their bodies are bought and sold as commodities. In examining the seriousness of the offense, the Court must review the harm to these women, as subtle as those harms may appear on their face. *United States v. Cunningham*, 680 F.Supp. 2d 844, 855 (N.D. Ohio 2010). Fifty-five percent of women

---

[2] The government notes that the evidence gathered during the investigation did not support charges of sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. § 1591 which would have subjected the defendant to a fifteen-year mandatory minimum period of incarceration.

and children who have been sold in the commercial sex trade report suffering from PTSD and 42% report attempting suicide at least once.[3] The women engaged in prostitution share common risk factors which make them vulnerable to this crime. It is not unusual for women to have been abused when they were young, been victims of rape, suffer from addictions, experience poverty or experience abusive relationships. While not all women engaged in commercial sex have difficult backgrounds or upbringings, it is not uncommon for these factors to be present. In this case, it is not clear how many of these risk factors were present with the commercial sex workers. However, of those that were interviewed in November 2023, most were undocumented with no or expired legal status in the United States. Some of the women were recruited while in their home countries to engage in commercial sex work upon arrival in the United States. Others began commercial sex work shortly after entering the country. And yet one indicated that it was not until she arrived in Boston in November 2023 that she realized what type of work she was expected to engage in to make money on behalf of Han's business.

Sadly, Han continues to believe that these women *chose* to work for her and were free to leave if they did not want to continue engaging in commercial sex. In determining a sentence under the § 3553(a) factors, this Court must consider how commercial sex work harms and effects women engaged in it. The backgrounds of the commercial sex workers recovered in this case make clear that engaging in this line of work was hardly *a choice* within the normal meaning of the word. It was a choice for the choiceless.

### 2. The Scope of Han's Prostitution and Money Laundering Conspiracies

Han's sophisticated prostitution business spanned multiple states, existed for years before law enforcement interdiction, and resulted in Han making millions of dollars off of commercial

---

[3] "The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities." Annals of Health Law 23, 61-91.

sex of other women. The multiyear investigation led by Homeland Security Investigations and the Cambridge Police Department showed that the prostitution organization operated two websites, www.bostontopten10.com and www.browneyesgirlsva.blog that operated as fronts for commercial sex services in the greater Boston and eastern Virginia areas. Women were advertised as "nude models" on more than one website as they traveled a circuit and engaged in commercial sex for the organization. The women in the advertisements were updated frequently, with postings that included "open" or "coming soon," showing a frequent rotation of women that kept the demand, and therefore profits, high.

Commercial sex operated out of brothels, specifically, high-end apartments in Cambridge and Watertown, Massachusetts and Fairfax and Tysons Corner, Virginia. Co-conspirators placed apartment leases in their names, or fraudulent identities, and paid for rent and utilities using structured money orders of prostitution proceeds. Men who solicited the brothels were extensively verified. They would complete a form on the website and at times, provide a referral from another network in which they were previously verified. In all instances, the men provided personal information and selfies which allowed Han to screen the sex buyers and ensure that none worked for law enforcement and could shut down her business. The customer lists were maintained in phones associated with each brothel website. The network used these phones to communicate with sex buyers and book and negotiate prices for their appointments. Once appointments were set, the women were notified about their schedule for the day. After a day's work, the women were permitted to stay at the apartments overnight so that they did not have to find lodging elsewhere.

Members of the organization, specifically Han and others acting at her direction, picked up the prostitution proceeds from the brothels and concealed the funds in various ways, including by purchasing structured money orders which were used to pay business expenses, by making structured cash deposits, and moving the funds throughout accounts managed by the co-

conspirators or various third parties. The prostitution business maintained records in the forms of appointment books and ledgers documenting volume of commercial sex dates and total earnings, which permitted Han to evaluate when and where to expand her business.

In sum, by the time search warrants were executed in November 2023, this multiyear, multistate business was a thriving criminal enterprise that brought in millions of dollars and enticed dozens upon dozens of women to travel to other states to engage in prostitution.[4]

### 3. The Staggering Amount of Profits Han's Business Made Off of the Sale of Women's Bodies for Sex

As detailed in the PSR, Han's prostitution business was extraordinarily profitable. Based on the calculation of prostitution proceeds set forth in the Affidavit in support of a Money Judgment (D.E. 157-1), the approximate gross revenue of all brothel locations for the time period of the conspiracy is $5,681,572. As the leader of the conspiracy, Han is responsible for the gross proceeds in the amount of approximately $5,418,572.  Such a high revenue is rarely seen in prostitution (brothel or illicit massage business) and money laundering conspiracy cases. Because this Court must determine an appropriate sentence based upon the various § 3553(a) factors, including the need to avoid unwarranted disparities pursuant to § 3553(a)(6), the government notes that few cases with proceeds at a similar magnitude may be persuasive in determining a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. *See United States v. Reiner*, 500 F.3d 310 (1st Cir. 2007) (60-months imprisonment and $3.92 million money judgment for illicit massage business operator charged with Mann Act and money laundering with a total offense level of 24); *United States v. Dubogryzov*, 06-CR-0233-CFD, 2007 WL 2904215

---

[4] *Contrast United States v. Camuti*, 950 F.2d 72 (1st Cir. 1991) (in which defendant sentenced to 18-months incarceration for singular Mann Act charge involving single victim, where relevant conduct included only two other victims in sting operation).

(D.Conn. 2008) (60-months imprisonment and $311,050.11 money judgment for money laundering and prostitution conspiracy charges); and *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) (120-months (on money laundering) and 180 months (on conspiracy) and $4.4 million money judgment for illicit massage operator).[5]

With these proceeds and without legitimate employment, Han lived in a luxury apartment building by herself and frequently shopped for luxury bags and shoes, making such purchases with cash or using debit cards held in her name. She concealed the money in many ways. Investigators were able to trace some of the proceeds through financial analysis. Because the proceeds were in cash and most of the money did not travel through the traditional banking systems, the government believes that $5.6 million is a conservative estimate, at best, of the proceeds earned by Han's prostitution network.

While the $5.6 million in prostitution proceeds is an enormous amount of revenue earned by an illicit business, the amount of commercial sex dates it equates to is incredibly sobering. During the time that Han managed the prostitution network, approximately 9,450 commercial sex dates occurred at her brothels.[6] Han emphasizes throughout her objections that the women kept most of the prostitution proceeds. Admittedly, the proportion of money kept by the women engaged in the sex work versus the money given to Han is impossible to quantify given the sophisticated methods of concealment in which Han engaged. One thing though is clear: that on

---

[5] The sentence in *United States v. Baker* was imposed prior to the 2001 Amendment to the money laundering guidelines; therefore, the GSR accounted for loss amount, which did not occur in Han's case.

[6] Although not an exact science, in arriving at this number, the government relied upon the data detailed in Affidavit submitted in support of the Motion for Money Judgment. Specifically, is based off of an average of the total number of commercial sex dates from the four representative months (540 commercial sex dates per month) multiplied by an average of "All Months Operating" (17.5 months) which resulted in 9,450 total commercial sex dates for the conspiracy.

9,450 occasions, Han profited – in some capacity – off of other women selling their bodies for sex to complete strangers. The amount of money earned by Han's criminal activity counsels in favor of an above-guideline sentence.[7]

### B. The History and Characteristics of the Defendant

#### 1. Han's Criminal History Score Understates Her Criminality

The PSR scores Han as being in criminal history category I. The government does not dispute this calculation, but the facts suggest that her criminal history score dramatically understates her criminality during the last decade since she entered the United States. Han is 42 years old and has no charges nor convictions on her record. Her past, however, suggests that she has been committing the crimes for which she is convicted for many years.

First, by her own admission, she has been engaged in sex work since she arrived in the United States in her early 30s. While it is unclear whether she worked for a prostitution network or on her own, or both, it is abundantly clear that she saw an opportunity in the commercial sex business to build and manage a prostitution organization of her own. Her business decisions were calculated was largely motivated by greed, and not life circumstance. She saw how lucrative and profitable commercial sex work was and wanted to make sure she controlled the Boston and eastern Virginia markets for it. Han relied on other women to engage in the work, knew how to market women on websites and price dates so that a business is profitable, vetted her sex buyers

---

[7] Similarly, Han's lack of candor with Probation related to her finances is troubling. The information contained in the PSR related to Han's ability to pay a fine is unverified and only self-reported. Han is married, her joint marital assets should be subject to an ability to pay; but despite her husband (who lives somewhere in Europe) making himself available to speak to Probation on her behalf, he did not share any information about his financial situation. Han did not share known financial accounts with Probation to assist them with running a credit check or identify any locations (bank accounts, cryptocurrency accounts, or otherwise) in which or where she may have offshored her money. Her lack of full candor, including that she has "no cash on hand and no assets," led the Probation Office to conclude that she does not have an ability to pay a fine because Probation is unable to corroborate her self-reported information.

to protect her business, hired others to assist her in running her business, had women engaging in – and encouraged them to return to engage in – sex work on behalf of her network, concealed and relied on others to conceal her illicit proceeds, and, understood how to further her illegal business by using her proceeds to pay for business expenses. These factors all suggest that Han has a very lengthy and serious history of making money off of illegal activity that is simply not captured by a criminal history score of I.

Additionally, Han's knowledge and use of techniques to avoid detection by law enforcement and to protect her business was striking and showed a level of experience that also is not captured by a criminal history score that reflects zero prior convictions. Han engaged in many methods of concealment to hide her operations and hide her profits. She advertised women as nude models for professional photography as a front for commercial sex services. She established a screening process to verify the sex buyers before they were allowed to have sex with the women that she advertised. She established "house rules" for the women during their stays in a given city to protect and maintain the secrecy of the business and ensure that the women did not draw attention to the prostitution work inside apartment buildings. She concealed her profits by using third-party accounts, structuring deposits, purchasing money orders, using structured money orders to pay for business expenses, moving money quickly through the banking system and overseas, purchasing stored value cards, and purchasing luxury items. Han's sophistication in running an illicit and profitable business over the course of years[8] evinces a level of criminality not reflected in a criminal history score of I.

---

[8] The government notes that the first known brothel lease, under Han's name, pre-dates the conspiracy period and the lease start date was in 2018. Likewise, records obtained by investigators showed that the Boston-based brothel website, www.bostontopten10.com, was registered in 2016.

2.  **Han Led Every Aspect of Her Business.**

Unlike other brothel and money laundering networks in which the business responsibilities are well divided, Han led and supervised every aspect of her business.[9] In that capacity, among other things, Han communicated with and recruited and enticed women to travel interstate and engage in commercial sex for cash in Boston and eastern Virginia; she posted the women's photographs on websites that served as advertisements for the commercial sex services; she determined the rates of each commercial sex dates; she determined the percentage of proceeds that would be paid to the women for commercial sex dates; she directed the women as to where to place their earnings (in the freezer) for later collection by her, by her employee Junmyung Lee, or by other co-conspirators as yet to be identified; she maintained and updated the websites and business records associated with her organization; she maintained the brothel units (both in Massachusetts and in her regular travels to Virginia) and had been seen picking up and dropping off females, dropping off supplies, paying for the rent and utilities, and entering and exiting the units regularly; she concealed millions of dollars in prostitution proceeds by purchasing structured money orders, sending money overseas, using the money to pay for business expenses, making cash deposits into known U.S. bank accounts of hers and third parties, and engaging in various bank and peer-to-peer (P2P) account transfers; she maintained brothel cell phones and arranged appointments for the customers and commercial sex workers; she enlisted James Lee to rent apartments in his true and fraudulent identities used for the prostitution business and field calls from apartment management to protect her business; she enlisted Junmyung Lee to rent apartments used for

---

[9] *Contrast United States v. T. Kim*, 18-CR-10397-DPW; *United States v. Y. Kim*, 18-CR-10396-WGY; *United States v. Bashir*, 18-CR-10188-ADB; *United States v. J. Kim*, 18-CR-10189-RWZ; *United States v. Kyung Song*, 18-CR-10217-DPW.

the prostitution business and to serve as the booker to manage and book appointments and screen prospective sex buyers as her business expanded; she paid for plane tickets for James Lee to travel to Boston and eastern Virginia to lease these apartments; and, she paid for air travel and rideshares for the commercial sex workers who traveled to Boston and eastern Virginia.

Simply stated, Han controlled all aspects of the day-to-day operations of her prostitution business, in an almost micromanaging fashion, and directed the laundering of her business' illicit proceeds. Her extensive involvement in managing all aspects of the illegal business and high-ranking managerial role support the government's recommended sentence. *See United States v. Cho*, 713 F.3d 716 (2nd Cir. 2013) (70-month sentence for brothel leader deemed substantively reasonable).

### 3. Han Took Great Pride in Becoming a Leader of a Very Profitable Organization Despite Knowing – and Ignoring – the Harms of Commercial Sex Work

Han took great pride in becoming one of the most successful prostitution managers in the country and admitted to it at her Rule 11 hearing ("It is true that I ran the sex business"). D.E. 114 at 27. She had a reputation among sex workers as being one of the "better" bosses. Indeed, this case did not involve the types of force, fraud or coercion often seen in sex-trafficking cases brought by the government. The victims working for Han were free to leave the brothels. [10] They chose when they would travel to which brothel location and negotiated the length of time that they would remain in either Boston or Virginia. The evidence also showed that Han paid the women a considerable portion of the profits, likely in the realm of 50-60% of the proceeds.

---

[10] There was an exception: Investigators observed on video surveillance inside one of the common hallways of the apartment buildings that Han locked the unit door from the outside after the women entered the unit.

These personal characteristics likely will lead Han to request a more lenient sentence than the nature of the offense requires. Arguably, Han did not physically assault or threaten physical harm on the women. The Government would advocate that this was not because she cared about their personal well-being, but because she wanted them to return to work for her or encourage the women in the sex worker network to work for Han.[11] Han paid the women at least half of the proceeds earned, not because she cared about their livelihood and financial success, but because she wanted the women to tell their friends that Han "paid well," which, in turn, would generate more women working for Han's business. Han went through great lengths to keep her business secret and to verify sex buyers, not because she cared about the women's safety, but because she wanted them to continue working for her and did not want her business compromised by law enforcement. Han protected the women because they were commodities of a business that needed to be protected so that she would profit off of them in the future. Han's decision to be a "good boss" was a strategic business decision, not a personal decision, designed solely to maintain high volumes of profits.  That fentanyl traffickers do not physically assault their runners or middle men does not mitigate their role as drug dealers. It makes them effective fentanyl dealers who, at the end of the day, are still harming vulnerable populations. The same is true here.

The fact that Han's business was so profitable and that she was profiting off of other women engaging in commercial sex for men does not appear to have posed a moral dilemma for Han, especially given how much money she made – and concealed – and how her prostitution business funded her lifestyle. This, too, goes to the history and characteristics of Han, but not in a mitigating sense. Han was not someone who was running a prostitution business to feed her family. That

---

[11] In fact, two women recovered on November 8, 2023 did return to work for her. One woman recovered in Virginia had previously worked for Han's Boston-based brothels. One woman recovered in Massachusetts had previously worked for Han's Virginia brothel, and in fact, brought "a friend" with her to work at the Boston-based brothel.

would still not excuse this behavior, but it is notable that Han was fueled by materialistic greed, not economic desperation. *See*, *e.g.*, PSR¶¶ 51-66; Detention Affidavit ¶¶11-15; 21-27.

### 4. Han Minimizes the Harm She Has Caused to the Commercial Sex Workers and Community

Han was well aware of the harms of commercial sex work from her own personal experience working in it. Han committed a serious crime that comes into sharper relief when the victims' decision to work for Han is viewed in context. Agents interviewed many of the women in the course of the investigation. Working for Han meant having sex with anonymous men for cash, often a dozen times a day, in unfamiliar cities in an unfamiliar country. The victims rarely left their apartments.. It speaks to the desperate circumstances these victims faced in their own lives that working for Han in this manner was among the better of some very bleak options. Han knew this well – she herself engaged in sex work "to support herself" and "averaged seven to eight men per day." PSR¶¶ 80-82. Han knew the pressures these victims faced and knew first-hand what it meant to work full-time as a sex worker. Despite knowing that harm, she grew and maintained a criminal enterprise built on prostitution, preying upon other women facing the kinds of circumstances she once faced.

While she has admitted to enticing women to travel interstate to engage in prostitution, Han is unwilling to admit – and instead vehemently denies – that she perpetuated harm on the commercial sex workers and the communities in which she ran her businesses. The fact that she has been unable to acknowledge that her business was harmful both to the communities and to the women who had sex with strangers at her direction shows her complete lack of remorse for her conduct and should cause this Court to question whether she will be deterred from engaging in criminal activity in the future.

What the facts and circumstances show about Han's personal history, background and characteristics is arguably filled with aggravating factors, not mitigating factors. The guideline of

51-63 months does not reflect the harms she has caused to the women and the community, the profits she has made through concealing proceeds of her illicit business nor the far-reaching nature of her criminal conduct. Even a high-end of guideline sentence is the most charitable view that Han's history and background mandates. An even greater downward variance – which the government understands will be requested by the defendant – is simply not supported by what is known about either the defendant's crimes or her personal characteristics.

### C.  The Need for the Sentence Imposed – Deterrence and Protection of the Public

### 1.  Specific Deterrence

The government submits that a sentence should be fashioned that affords adequate deterrence to the defendant. Her criminal enterprise ended not because she confronted a crisis of conscience and voluntarily shuttered it; it ended because the agents arrested her and the principal participants in her enterprise.  After engaging in sex work herself and presumably working for a prostitution business and seeing firsthand the harm it could cause – an experience that she will likely state as grounds for judicial leniency –she was nonetheless undeterred. She saw how other prostitution business profited and rose to a leadership position by starting her own prostitution business in which she perpetuated that painful fate for others. Indeed, she continued to operate – and expand – the Virginia and Massachusetts brothels right up until they were raided by law enforcement. A significant period of incarceration is needed both to reflect the seriousness of the offense and more broadly to deter others from engaging in illegal prostitution and money laundering schemes.

### 2.  General Deterrence

A significant period of incarceration is especially important for this type of crime, which is often viewed by the public as not serious, and not likely to attract the attention of federal law enforcement. Han's organization was active; it was widespread; and although there were attempts

to evade detection, it was relatively overt. The websites advertising the services were not hidden on the dark web, but were rather on the open internet, with website names that made them relatively easy to find (e.g., www.bostontopten10.com and www.browneyesgirlsva.blog). High-end prostitution networks of this nature are relatively common and are sometimes easy for local law enforcement to spot, but there are significant challenges to investigating and prosecuting these types of prostitution and money-laundering networks. These challenges include language barriers, the inherently private nature of the prostitution activity, the desire for sex buyers to remain anonymous (and their resulting covert behavior), and the frequent cash transactions in small dollar amounts (which become significant due to their volume, but which generally do not trigger reporting requirements or attract bank suspicion if artfully deposited). It is important as a matter of general deterrence that when law enforcement invests the resources in thoroughly investigating and uncovering such networks, as they did here with the participation of both federal and local law enforcement, there are significant consequences for the participants.

The investigation established that women who worked for Han's organization also worked for other prostitution organizations in various cities across the country. These women communicate with each other frequently, discussing various aspects of the prostitution business, and crucially, any law enforcement activity they encounter. The prostitution networks they work for are also aware of and regularly monitor law enforcement activity. The enforcement actions taken in Massachusetts and Virginia and shuttering of Han's prostitution business reached other similar prostitution networks throughout the United States. A significant period of incarceration for Han will reach those networks as well. Thus, the potential for general deterrence in this matter is real and far-reaching and is particularly important because Han's enterprise – like so many

prostitution networks – was highly profitable. [12]

### 3. The Need for Supervised Release

The guideline provisions for these charges includes a period of supervised release, ranging from one to three years. Han's immigration status does not form a basis to depart from that recommended range of supervised release. This Court retains discretion to impose supervised release where it determines that supervised release "would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." USSG § 5D1.1(c), comment (n.5). The "term 'ordinarily in section 5D1.1(c) is 'hortatory, not mandatory.'" *United States v. Aplicano-Oyuela*, 792 F.3d 416, 424 (4th Cir. 2015) (quoting *United States v. Dominguez-Alvarado*, 695 F.3d 324, 329 (5th Cir. 2012)). Imposing supervised release for a period of three years would serve as additional accountability for Han to this Court should she return to the United States unlawfully, particularly where she has admittedly spent her entire time in the United States engaged in criminal activity, including the prostitution of herself and others and the laundering of her illicit proceeds. Likewise, supervised release will deter the defendant from returning to the United States upon deportation, unless she returns by lawful means.

### D. The Pertinent Sentencing Commission Policy Statements Regarding the Intended Purpose of Sentencing Under the Money Laundering Guidelines Further Supports the Government's Above-Guideline Recommendation

The lengthy discussion about the nature and circumstances of the crime, the defendant's background and the need to deter others and protect the public hopefully conveys to the Court why the sentencing factors set forth in 3553(a) strongly support the type of sentencing the government

---

[12] Prostitution networks like Han's are successful because a demand exists for the purchase of sex. As evident from the size of Han's business, with four brothels in Massachusetts and two in Virginia at the time of her arrest in November 2023, the demand in those communities was real and substantial. Indeed, law enforcement's exposure of Han's prostitution network should also provide a basis for deterring sex buyers from purchasing others for sex.

is seeking here. The intended purposes of the Commission's 2001 amendments to the money laundering guidelines, which the government argues is not met by the calculated GSR, also supports an upward variance as well. Here, the money laundering guidelines understate the seriousness of the defendant's conduct in this case. Han obtained the funds that she laundered from her highly successful, and incredibly profitable, prostitution business. The sex crimes guidelines, particularly § 2G1.1, do not consider the amount of money laundered in calculating the base offense level. See generally USSG § 2G1.1. Accordingly, because the money laundering guidelines calculate the base offense level for direct money launderers, like Han (i.e., those who launder the profits of their own criminal activities) based on the underlying offense, the amount of funds that were laundered was not considered in calculating the offense level for the money laundering guidelines. See id. § 2S1.1(a)(1); id. app. C, vol. II at 222 (2001), Amend. 634, Reason for Amendment.

On the other hand, the money laundering guidelines calculate the base offense level for third party money launderers (i.e., those who launder funds other than those obtained through their own criminal activity), based off the total amount laundered; thereby taking into account the full scale of the illicit proceeds laundered.[13] Hypothetically, if a third-party laundered money on Han's behalf and did not play a role in the large-scale underlying prostitution conspiracy, he would have a higher guideline range because the quantity of illicit funds – over $5.6 million – is so large.[14] Indeed, this was not the intended purpose of the Sentencing Commission in its 2001 Amendment

---

[13] *See*, *United States v. Blackmon*, 557 F.3d 113, 118 ("Direct launderers are those who also commit the crime that produces the illicit funds, whereas third-party launderers have no involvement in the underlying offense and _only_ launder the money generated from that offense.") (emphasis added).

[14] If calculated under § 2S1.1(a)(2), the base offense level would be 8, which would be increased by 18 because of USSG § 2B1.1(b)(1)(J) because the laundered funds were more than $3,500,000 but less than $9,500,000, resulting an offense level – before enhancements – of 26.

to § 2S1.1. *See Blackmon*, at 119 ("Not surprisingly, a defendant sentenced under subsection (a)(1) often gets a higher sentence than a less culpable offender sentenced under subsection (a)(2)").

A successful leader like Han, who ran a massive, sophisticated prostitution business that spanned multiple states and involved the laundering of over $5.6 million in proceeds, should not face a lesser sentence than a third-third party launderer who does not engaged in the underlying criminal activity. See id., § 2S1.1(a)(1) and USSG supp. to app. C amend 634 (Nov. 1, 2001) (explaining that section 2S1.1 is intended "to promote proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct. . .that generate relatively high loss amounts"). The intended purpose of the Sentencing Commission is another § 3553(a) factor that supports an above-guideline sentence for Han's massive criminal enterprise.

### III.    CONCLUSION

For the reasons stated in this memorandum and those to be advanced at the hearing, the government recommends that the Court sentence Han Lee to 72 months in custody, to be followed by 36 months of supervised release. In addition, the Court should order forfeiture to the extent detailed in the motion for money judgment, supporting affidavit and preliminary orders of forfeiture. Lastly, the Court should consider a fine, even if just a principled matter, because the government rejects the notion that Han Lee has zero assets.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  /s/ *Lindsey E. Weinstein*
LINDSEY WEINSTEIN
Assistant United States Attorney

March 14, 2025

<u>**Certificate of Service**</u>

I hereby certify that I submitted this document for electronic filing via the ECF system, which will send an electronic copy to all counsel of record who are identified on the notice of electronic filing.

By: <u>/s/ *Lindsey Weinstein*</u>
LINDSEY WEINSTEIN
Assistant United States Attorney
District of Massachusetts